UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
DOV LEVINE,

                Plaintiff,

        - against -

THE READER'S DIGEST ASSOCIATION, INC.,

                Defendant.
------------------------------------------------------------x

06 Civ. 0590 (CLB)

*Memorandum and Order*

Brieant, J.

      Before this Court for decision is Defendant's Motion for Summary Judgment (Doc. 6). Motion for Discovery (Doc. 11) is marked withdrawn and Motion for Leave to Reply (Doc. 19) is granted.

      This is an action under the ADEA, 29 U.S.C. § 621 et seq., with supplemental claims arising under New York law.

      The following facts are undisputed or assumed true for the motion. Plaintiff, Dr. Dov Levine, Ph.D. is an American Citizen who was hired in 1972, at the age of 27, to work in Switzerland at Das Beste Aus Reader's Digest AG, a Swiss Corporation and a subsidiary of Defendant Reader's Digest Association, Inc. ("RDA"), a Delaware corporation with headquarters in Pleasantville, New York in this district. Plaintiff was terminated on October 2003, allegedly in violation of the ADEA.

      Plaintiff contends he was hired initially at the insistence of RDA headquarters, to replace

a database system used in Zurich with a more sophisticated system. Between 1972 and 2003, Dr. Levine had supervisors in Zurich and also reported frequently and regularly to RDA Headquarters in Pleasantville, New York. Until the time of his dismissal, and as recently as three months prior to his termination, Plaintiff received outstanding performance reviews, including but not limited to the following:

- "...In the last few weeks and months, you have, within the frame of special projects repeatedly given us huge support. It gives me enjoyment and enrichment to be allowed to work together with you"(translated from German), complaint at ¶ 24.

- "For you performance and as a visible recognition for your commitment in this difficult year, I can announce for you a bonus payment in the amount of Sfr. 5563. Payment will be effected with the August salary. Along with this special compensation, I would like to thank you for the work that you have performed until now and I also connect it with the confidence in your further personal commitment. This is all the more important as we are in a very difficult economic environment and desire to reach the goals that were set for the next fiscal year 04 that is already in progress," (translated from German) Id. at ¶ 25.

On October 29, 2003, Dr. Levine was advised, suddenly, in a letter handed to him, that his employment would be terminated on January 31, 2004, because his "personal limitations within [his] . . . function" were "so seriously impacting" that he was "unable to fully perform within [his] . . . function." The termination letter further states in relevant part, as translated by Dr. Levine (it is unclear as to whether the translation is poor, or whether the original was written poorly):

> Despite the fact that you ultimately made an effort to acquire basic system skills, you are far from remotely meeting the requirements placed upon an adequate database management. Unfortunately you are unable to match your database analyses with the marketing needs and your lack of strategical thinking negatively on an market oriented further development. Your understanding of major endeavours, which will really help the company on and the routine, daily

> requirements in your function and position make work immensely difficult for the customers of your services.
>
> We are not able to accept any longer, that an employee within this income group fulfills his function with outdated work tools and thus very inefficiently.
>
> Based on above mentioned reasons and due to your insufficient communications within the local and the global company we are unable to continue our employee-employer relationship with you... *See* RDA Exh. A.

Dr. Levine contends his discharge was discriminatory (based on his age), as further evidenced by the fact that a 26-year-old was hired soon thereafter to replace him (she was subsequently dismissed). Plaintiff expressed his concerns in an e-mail dated November 11, 2003, sent to his immediate supervisor, with the request that its contents be communicated to RDA Headquarters in Pleasantville. He noted that his dismissal violated the corporate "Code of Conduct" signed annually by employees and e-mailed directly to RDA Headquarters in Pleasantville, and that 150,000 Swiss francs and all pension benefits would be a "proper settlement" to resolve his unfair termination. On November 13, 2003, Dr. Levine received an e-mail from Peter Braun, the Human Resources Manager in the Zurich office, acknowledging receipt of Dr. Levine's e-mail and requesting "patience" because the matter was going to be discussed with Werner Neuzig, a signatory to the October 2003 termination letter, and also manager of the Zurich office. On November 19, 2003–before Plaintiff received any further response–he was told to leave the office.

When Plaintiff arrived at his residence in Zurich, he received a telephone call from Giovanni di Vaio, Director of International Human Resources at RDA's Pleasantville office.

Mr. di Vaio knew about the expulsion that had occurred just a few hours earlier. He claimed to be investigating whether the October '03 termination letter had violated RDA's "Code of Conduct," and Dr. Levine contends that di Vaio led him to believe that he was sympathetic to Levine's discrimination claim. He asked Dr. Levine to send an English translation of the letter to him. Following this conversation, di Vaio advised Dr. Levine's supervisors in Stuttgart and Zurich, and RDA's General Counsel Michael Brizel, that he would send Dr. Levine a letter in which he would say that he looked forward to receiving the translation of the termination letter that Levine promised you were going to send, and that he would promise to look into Levine's case with great attention to verify the discrimination claim. The letter that was eventually sent to Dr. Levine from di Vaio stated in relevant part: "I can promise that I will look into your case with great attention should you provide to me any evidence that supports a claim of discrimination and, should you provide such evidence, I will come back to you as soon as possible." Lev. Dec., Exh. 7.

Dr. Levine contends that he and his attorney, Nathan Lewin, Esq., both sent letters on November 20, 2003 to Mr. di Vaio, and that Atty. Lewin sent a second letter on November 24, all expressing the belief that Mr. di Vaio was engaged in further consideration of Plaintiff's claims, and expressing hope that Reader's Digest would conclude its relationship with Dr. Levine on a harmonious note. On November 26, 2003, RDA's General Counsel Michael Brizel sent a letter to Atty. Lewin replying to the Nov. 20 and 24th letters sent to Mr. di Vaio. The Court understands from the argument that the note from General Counsel Brizel did not suggest that the decision to dismiss Dr. Levine had been made exclusively by Das Beste or by Dr.

4

Levine's superiors in Stuttgart and Zurich, and conceded that RDA was involved in the decision making.

It also asserted that for quite some time, Dr. Levine's performance has not been satisfactory, and that this was communicated to him numerous times, both orally and in writing, and that witnesses were available to substantiate the oral communications.

*Unlawful Retaliation and Tortious Interference Claims:*

     Plaintiff further contends the following: On November 27, 2003, Dr. Levine signed an agreement with Das Beste, which was to provide Plaintiff with severance in the amount of 90,000 Swiss francs. *See* Compl. at 38. However on December 5, 2003, Das Beste demanded in an English-language letter that Plaintiff sign a "General Waiver and Release of Claims," as a condition for receiving the payment that was due to him immediately from Das Beste; in which he would, *inter alia*, waive his right to claim that his dismissal was an act of harassment, bias, or discrimination. Plaintiff refused to sign this "waiver." In retaliation for Plaintiff's assertion of his rights under U.S. law, Defendant has directed its subsidiary, Das Beste, to withhold payment of the amount specified in the written agreement between Plaintiff and Das Beste. Plaintiff sued Das Beste in the Swiss Courts, seeking to enforce the agreement. Plaintiff states that "[o]n May 24, 2004, a Swiss court entered the equivalent of summary judgment in Plaintiff's favor," Compl at ¶ 43; Defendants state that on "June 21, 2005, the Zurich Labor Court issued a judgment holding that there was no enforceable agreement between Das Beste and plaintiff pursuant to which Das Beste was obligated to pay plaintiff any severance. Plaintiff has appealed from that judgment." *Defendant's Memorandum of Law in Support of Summary Judgment* at p. 5. These

5

representations conflict somewhat, and the status of the Swiss litigation seems unclear.

Plaintiff seeks compensatory and additional liquidated damages, and an order compelling payment of 90,000 Sfr. in severance, punitive damages, attorneys' fees and costs, and any other relief this Court deems just and proper. A jury trial is also demanded.

Defendant seeks summary judgment, contending: that Plaintiff's ADEA claim must be dismissed because RDA did not control Das Beste within the meaning of 29 U.S.C. § 623(h)(3); that the ADEA claim also should be dismissed because the EEOC Charge was not filed within 180 days of notice of termination; and that Plaintiffs state law claims should be dismissed because there was no enforceable agreement between Plaintiff and Das Beste and/or because a parent company cannot, as a matter of law, be found to have tortiously interfered with a contract to which its subsidiary was a party.

*Summary Judgment Standard:*

Fed. R. Civ. P. 56(c) provides that summary judgment shall be rendered if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." If "reasonable minds could differ as to the import of the evidence," summary judgment is inappropriate. *Anderson v. Liberty Lobby*, 477 U.S. 242, 250 (1986). In evaluating the record to determine whether there is a genuine issue as to any material fact, "the evidence of the non-movant is to be believed and all justifiable

inferences are to be drawn in his favor." *Anderson* at 255. If, as to the issue "on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d. Cir. 1994).

*The ADEA:*

RDA contends that Plaintiff has no claim under the ADEA because Das Beste is exempt from liability pursuant to the statute's "foreign employer" exemption, which provides that "the prohibitions of this section shall not apply where the employer is a foreign person not controlled by an American employer." 29 U.S.C. § 623(h)(2). Under this exemption, an employee at a workplace in a foreign country is not protected under the ADEA if the employer is a foreign person not controlled by an American employer. *See Morelli v. Cedel*, 141 F.3d 39, 43 (2d Cir. 1998).

Here, the parties disagree about which entity is Plaintiff's employer for the purposes of the ADEA exemption analysis. RDA contends that Plaintiff was employed by Das Beste, an entirely distinct, subsidiary company; Plaintiff contends that: 1) Das Beste and RDA should be considered a single employer for the purposes of the ADEA; and 2) that RDA was his true or actual employer for the purposes of the ADEA. Our Court of Appeals applies a four-part test for determining when parent companies may be considered employers of a subsidiary's employees. *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1240-41.

7

A parent and subsidiary cannot be found to represent a single, integrated enterprise in the absence of evidence of (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control. *See id.* at 1241. The second factor--centralized control of labor relations--is the focus of the inquiry. *See id.* "Even though *Cook* is a Title VII case, it is equally applicable here, in the context of the ADEA." *Sabol v. Cable & Wireless PLC*, 361 F. Supp. 2d 205, 208 (March 7, 2005) (Robinson, J.) *citing Lowe v. Commack Union Free School Dist.*, 886 F.2d 1364, 1369 (2d Cir. 1989) (Title VII principles are applicable to ADEA cases since the substantive prohibitions of the ADEA were derived *in haec verba* from Title VII) (internal quotations omitted).

Here, Plaintiff has presented evidence which raises material questions of fact as to whether Das Beste acted singularly when deciding to terminate Dr. Levine and when addressing his discrimination claims thereafter. Dr. Levine reports that he had supervisors in Zurich, but that he also reported frequently and regularly to RDA Headquarters in Pleasantville, New York; thus he contends that it is unclear whether the decision to fire him came from Pleasantville, or if it came from Zurich. Defendant contends it came solely from abroad, and that Das Beste, and not RDA, had the sole power to terminate Levine. This is a genuine issue of material fact as to-whether RDA and Das Beste are a single employer for the purpose of Plaintiff's ADEA claim, precluding summary judgment on that ground.

Defendant contends also that the ADEA claim must be dismissed because the EEOC charge was not filed within 180 days of notice of termination. The Court disagrees. The

statutory 180-day period does not begin to run until the employee receives "a definite notice of termination." *Miller v. IT & T*, 755 F.2d 20, 23 (2d. Cir. 1985). Dr. Levine was told by the Human Resource director to have "patience" until the matter could be discussed with Mr. Neunzig, and he was advised by Mr. di Vaio that di Vaio was reviewing the facts and circumstances related to Levine's discrimination claim. Dr. Levine's counsel made clear in his letters that he viewed the validity and terms of any dismissal as being under consideration until he received Mr. Brizel's letter on November 26, 2003, which is discussed *supra*. Therefore, Plaintiff's filing is timely, as made on May 12, 2004.

As stated by Our Court of Appeals in *Enercomp, Inc. v. McCorhill Pub., Inc*., 873 F.2d 536, 541 (2d. Cir. 1989):

> To recover for tortious interference with a contract under New York law, a complainant must prove the existence of a valid contract between the plaintiff and a third party, the defendants' knowledge of that contract, and defendants' improper intentional interference with its performance. Improper intentional interference is generally evidenced by a tortfeasor inducing or otherwise causing [a] third person not to perform" his contractual obligations to plaintiff. Internal quotations omitted.

This Court agrees that a parent causing a subsidiary to breach a contract it has with a third party cannot be liable for tortious interference. In any event, the November 27, 2003 agreement is in litigation initiated between the parties in the Zurich Labor Court by Plaintiff. Having done so, Plaintiff should not be permitted to sue directly or indirectly on the same agreement in this Court. A final adjudication in Zurich will be binding on Das Beste and Plaintiff, and should be entitled to comity in this Court.

9

**Conclusion**

The tortious interference claim is dismissed. In all other respects, the motion for summary judgment is denied. The Court declines at this time to make the finding contemplated by Rule 54(b) Fed.R.Civ.P.

X

X

X

X

X

SO ORDERED.

Dated: White Plains, New York
      June 16, 2006

                                                                       Charles L. Brieant, U.S.D.J.